1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**

For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Oncology Therapeutics Network Connection,

          Plaintiff,

    v.

Virginia Hematology Oncology PLLC, a limited liability company; Ronald Poulin, an individual,

          Defendants.

_____/

No. C 05-3033   WDB

**ORDER AND MEMORANDUM OPINION (I) GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OF PLAINTIFF'S CLAIM FOR BREACH OF PERSONAL GUARANTY AND (II) DENYING PLAINTIFF'S COUNTER MOTION FOR SUMMARY JUDGMENT AND (III) GRANTING PLAINTIFF'S MOTION FOR LEAVE TO AMEND THE COMPLAINT**

## INTRODUCTION

For reasons we will explain in the pages that follow, we hereby GRANT Ronald Poulin's Motion for Summary Judgment on plaintiff's claim that he is personally liable as a guarantor of the debts in issue of Virginia Hematology Oncology ("Virginia Hematology").  As stated in section I.E., we also DENY plaintiff's "Counter Motion for Summary Judgment."  Simultaneously, we GRANT, on conditions later specified, plaintiff's motion for leave to amend and supplement its complaint.

Oncology Therapeutics Network ("OTN") sells products used by health care providers in the treatment of cancer patients.  Virginia Hematology is an entity

1

whose members treat cancer patients.  Ronald Poulin is a physician at and "managing member" of Virginia Hematology.

On January 25, 2002, Ronald Poulin signed a contract titled "Credit Application and Agreement."  The Credit Application and Agreement ("CAA") was a form provided by OTN.  The form included OTN's logo on the top left corner and "Oncology Therapeutics Network Joint Venture, L.P. ('Seller') Commercial Credit Agreement" was centered at the top of the second page (back) of the agreement.  Among other things, the CAA provided Virginia Hematology with a line of credit under which it could purchase and receive oncology products and pay for them at a later date (*e.g.*, after Virginia Hematology received payment for the supplies from a patient's insurer).

It is undisputed that OTN products were purchased under the CAA and were shipped to Virginia Hematology.  It also is undisputed that, at some point, Virginia Hematology began to fall behind in its payments to OTN.

On June 30, 2005, in San Mateo, California, plaintiff filed its Complaint for Goods Sold and Delivered ("Complaint").  See, Defendants' Notice of Removal, filed July 27, 2005, at Ex. B.  Among other things, OTN alleged that Virginia Hematology has failed and refused to pay amounts owed under the CAA.  OTN also alleged that, by signing the CAA, Dr. Poulin personally guaranteed Virginia Hematology's debt and, therefore, that Dr. Poulin was personally obligated to pay the amount owing.

On July 27, 2005, defendants removed plaintiff's action to federal court.

On December 16, 2005, Dr. Poulin filed his Motion for Summary Judgment ("Motion").  Dr. Poulin states that he signed the CAA as a representative of Virginia Hematology only and not in his individual capacity, and asks the Court to find that, as a matter of law, his signature on the CAA did not create a personal

1 guaranty.  Along with its Opposition to defendant's Motion, plaintiff presents a
2 "counter motion" for summary adjudication.

3       On January 9, 2006, pursuant to a briefing schedule established by the
4 Court, plaintiff filed its Motion for Leave to File First Amended Complaint
5 ("Request to Amend").  Plaintiff seeks to add allegations that defendants engaged
6 in fraudulent conveyances and allegations that Dr. Poulin is the alter ego of
7 Virginia Hematology and/or that a second entity created by Dr. Poulin, VHO,
8 PLLC ("VHO"),[1] is liable as Virginia Hematology's successor.

9       On February 1, 2006, the Court conducted a hearing in connection with Dr.
10 Poulin's Motion for Summary Judgment and plaintiff's Request to Amend.

11       For the reasons stated below, the Court GRANTS defendant's Motion for
12 Summary Judgment and DENIES plaintiff's "counter motion" for summary
13 judgment.  Subject to the conditions set forth, *infra*, the Court also GRANTS
14 plaintiff's Request to Amend.

15
16 **DISCUSSION**
17 **I.**     **Dr. Poulin's Motion for Summary Judgment**
18     **A.**     **Standard on Summary Judgment**

19       To succeed on a motion for summary judgment, the moving party must
20 establish that, under facts that are not subject to genuine dispute, that party is
21 entitled to judgment as a matter of law.  Federal Rule of Civil Procedure 56(c).  In
22 reviewing a motion for summary judgment, the Court considers the evidence in the
23 light most favorable to the party against whom the judgment is sought.

24       If, when we consider the evidence in the best possible light for plaintiff, the
25 evidence is insufficient (as a matter of law) to support a finding by the trier of fact

26
27      [1]Although the parties have referred to the entities as "VHO #1" and "VHO #2," for the
sake of clarity, we refer to the original entity Virginia Hematology Oncology, PLLC, (VHO #1),
28 as "Virginia Hematology" throughout and refer to VHO, PLLC (VHO #2) as "VHO" throughout.

1  that plaintiff has proved all required elements of his claims we must grant the

2  request for summary judgment.

3        In his Motion, Dr. Poulin argues that (1) collateral estoppel bars plaintiff

4  from asserting that the language in the CAA creates a personal guaranty on behalf

5  of the signatory, (2) pursuant to California contract law principles, the language of

6  the CAA does not create a personal guaranty as a matter of law, and (3) even if the

7  CAA had created a personal guaranty, Dr. Poulin has been exonerated from that

8  debt by virtue of the fact that OTN and Virginia Hematology substantially

9  modified the terms of the original agreement.  We address defendant's arguments

10  below.

11

12

13       **B.**     **Collateral Estoppel Bars Plaintiff's Claim**

14        Dr. Poulin invokes the doctrine of "defensive collateral estoppel" and asks

15  the Court to bar plaintiff's claim that the CAA created a personal guaranty on the

16  ground that plaintiff previously litigated that identical claim against another

17  litigant and lost.  With defensive collateral estoppel, a defendant "seeks to prevent

18  a plaintiff from asserting a claim the plaintiff has previously litigated and lost

19  against another [party]." *Masson v. New Yorker Magazine*, 85 F.3d 1394 (9th Cir.

20  1996).[2]

21        In order to invoke collateral estoppel "(1) the issue at stake must be

22  identical to the one alleged in the prior litigation, (2) the issue must have been

23  actually litigated in the prior litigation, and (3) the determination of the issue in

24  the prior litigation must have been a critical and necessary part of the judgment in

25

26

27      [2]In his Motion, Dr. Poulin erroneously refers to "offensive collateral estoppel" which

28  applies where a plaintiff seeks to use the doctrine against a defendant.

1   the earlier action."  *Clark v. Bear Stearns and Co.*, 966 F.2d 1318, 1320 (9th Cir.

2   1992).

3         Dr. Poulin contends (1) that plaintiff was a party to an adversary claim

4   before the bankruptcy court in *In re San Jose Medical Mngmt, Inc., (Vold v. San*

5   *Jose Medical Mngmt., Inc., et al*), C02-55527 JRG and C02-55528 JRG (*"Vold,"*),

6   (2) that, in that proceeding, plaintiff asserted that the identical language in an

7   identical credit application created a personal guaranty by the signatory, Mr. Vold,

8   (3) that the bankruptcy court ruled that the language in the Credit Application did

9   not create a personal obligation, and (4) that the bankruptcy court's holding was a

10  critical and necessary part of the bankruptcy court's judgment.  Motion at 8-14.

11  See also, Defendant's Request for Judicial Notice, filed December 16, 2005.

12        Plaintiff counters by asserting that the facts before the *Vold* court were

13  materially different than those before this Court and, therefore, that Dr. Poulin

14  cannot demonstrate that the issue at stake in that litigation was "identical" to the

15  issue presented here – a necessary prerequisite to invoking collateral estoppel.[3]

16  See, Transcript of February 1, 2006, hearing.  More specifically, plaintiff contends

17  that it was essential to Judge Grube's opinion in *Vold* that Mr. Vold's position with

18  the oncology provider in that case was as a "CFO" and that there was no indication

19  he owned any share of the practice.  Plaintiff also notes that Mr. Vold drew a line

20  through part of the application and then attached the entity's credit information on

21  a separate sheet, rather than writing the information in the spaces provided on the

22  form.  In contrast, Dr. Poulin is a physician at the practice (and, therefore, the

23  argument presumably goes, the practice is primarily for his benefit), Dr. Poulin

24  owns a substantial portion, if not all, of Virginia Hematology, and Dr. Poulin did

25

26

27        [3]Defendant anticipated an argument from OTN that it was not actually a party to the *Vold*
    litigation.  Motion at 12-13.  Plaintiff made no such argument in its Opposition.  We, therefore,
28  assume OTN concedes that it was a party to the *Vold* litigation for these purposes.

1    not draw a line through any of the form contract and attach Virginia Hematology's

2    credit information on a separate sheet.

3         As explained on the record, in the Court's view, the *Vold* court's opinion

4    satisfies the requirements for asserting defensive collateral estoppel.  As we read

5    *Vold*, Judge Grube did <u>not</u> rely on evidence outside the language of the contract.

6    Judge Grube reviewed the language of the <u>identical</u> sentence on which OTN relies

7    in this case and, as we read his opinion, considered whether <u>this language</u>, <u>if</u>

8    <u>unsupported by extrinsic evidence</u> that could sustain a finding that the parties

9    mutually intended the signatory to be personally liable, creates a personal

10   guaranty.[4]  Judge Grube ruled that it did not.

11        Judge Grube's opinion indicates that he relied on the language of the

12   contract itself.

13        The court [is] left to discern the meaning of the clause through the
14        terms of the agreement itself.

15   RFJN at Ex. E (Grube Order) at 12.

16        An examination of the extrinsic evidence offered in this case provides
     no support that OTN's interpretation is reasonable.

17   RFJN at Ex. E (Grube Order) at 10.  See also, RFJN Ex. D at 6 ("the question of

18   the guaranty comes down to one sheet of paper, the credit application and

19   agreement").  Statements made by Judge Grube at oral argument on the Vold

20   motion provide further support for the conclusion that Judge Grube's reasoning

21   encompassed <u>any agent</u> who would be authorized to sign on behalf of the entity.

22   RFJN at Ex. D at 4.  For these reasons, we conclude Judge Grube did not deem it

23   material that Mr. Vold was a CFO, as opposed to an owner or managing director,

24

25

26        [4]We have identified two sentences on the back of the contract that contribute to our
27   finding of ambiguity that it appears Judge Grube did not consider. However, as explained, *infra*,
     these sentences are only marginally susceptible to plaintiff's proffered meaning, and we find
28   them legally irrelevant for this analysis.

1    or that Mr. Vold provided the information sought by OTN on a separate sheet

2    rather than in the spaces set forth on the form.

3        The facts in *Vold* are in all material respects identical to those here.  It was

4    undisputed that no communication had taken place regarding the nature of the

5    CAA.  RFJN (Grube Order) at Ex. E at 3 and 10.  Mr. Vold signed the identical

6    form contract Dr. Poulin signed.[5]  Mr. Vold did <u>not</u> draw a line through the

7    language that plaintiff contends created the personal guaranty and, just as with Dr.

8    Poulin, that language immediately preceded Mr. Vold's signature.  In our view,

9    Judge Grube decided the <u>identical</u> issue that confronts this Court, whether, absent

10    extrinsic evidence supporting personal liability, the language of the contract

11    creates a personal guaranty by the signatory.  See, section C, *infra*.

12        It is clear from the record that the *Vold* parties fully and fairly litigated the

13    meaning of this language before Judge Grube.  Additionally, whether the Credit

14    Application created a personal guaranty by Mr. Vold was the sole issue before

15    Judge Grube and, therefore, determination of the issue was "a critical and

16    necessary part of [Judge Grube's] judgment."

17        We conclude that the *Vold* opinion satisfies the requirements of defensive

18    collateral estoppel and that collateral estoppel, therefore, constitutes an

19    independent and sufficient basis on which to GRANT defendant's motion.

20        In the next section we consider whether defendant has established an

21    additional and separate ground for summary judgment by demonstrating that, as a

22    matter of law, the CAA did not create a personal guaranty.

23    //

24    //

25    //

26

27        [5]The form in *Vold* and this case appear to be identical except for a change in the OTN

28    logo.

**C.   The "Credit Application and Agreement" Does Not Create a Personal Guaranty**

Dr. Poulin asks the Court to find that there are no material facts subject to a genuine dispute and that, as a matter of law, the CAA does not create a personal guaranty by Dr. Poulin.  Plaintiff, on the other hand, argues that the CAA must be interpreted to create a personal guaranty by Dr. Poulin and asks the Court to enter summary judgment in its favor.

The parties focus on the following language found immediately before the signature line at the bottom of the first page:

> The person signing below personally guarantees that Applicant will pay all amounts due under this Agreement and shall be responsible for such amounts being paid.

Poulin Decl., at Ex. A.

The contract provides that the "Agreement will be governed by and construed in accordance with the laws of the State of California."  Poulin Decl., at Ex. A.  Neither party disputes that California law governs interpretation of the contract.  Under California law, in order to resolve the parties' dispute, we must determine whether it is objectively reasonable to conclude that the parties mutually intended to create a personal guaranty.

> In this state, . . ., the intention of the parties as expressed in the contract is the source of contractual rights and duties.  A court must ascertain and give effect to this intention by determining what the parties meant by the words they used.

*Pacific Gas and Electric, Co., v. G.W. Thomas Drayage & Rigging Co., Inc.*, 69 Cal.2d 33, 38 (1968).  "The precise meaning of any contract, . . . , depends upon the parties' <u>expressed</u> intent, using an <u>objective</u> standard."  *ASP Properties Group, v. Fard, Inc.*, 133 Cal.App. 4th 1257, 1266 (4th Dist. 2005) emphasis added *quoting Golden West Baseball Co., v. City of Anaheim*, 25 Cal.App.4th 11 (1994).

Where the parties disagree about the meaning of the contract, the Court construes the contract using a two step process.

8

First, the Court must determine <u>whether</u> the contract is "ambiguous."  A contract is ambiguous when "it is 'reasonably susceptible' to either of the meanings urged by the parties."  *Curry v. Moody*, 40 Cal. App. 4th 1547, 1552 (2nd Dist. 1995).  A contract may be ambiguous on its face, for example, where the language used therein is imprecise.  However,

> [i]n making this determination, the court is not limited to the contract language itself but provisionally receives, without actually admitting, any extrinsic evidence offered by a party which is relevant to show the contract could or could not have a particular meaning.

*Curry*, 40 Cal. 4th at 1552.[6]  Whether the contract is "ambiguous" is a question of law.  *Id*.  If the language of the contract cannot <u>reasonably</u> be construed as a party suggests – even considering extrinsic evidence offered by the party – then the Court will find that the contract is <u>not</u> "ambiguous" and the inquiry is over.

If, on the other hand, the Court finds that the contract is "reasonably susceptible to either of the meanings urged by the parties" then the Court "moves on to the second step which is to determine just what the parties intended the contract term to mean."  *Curry*, 40 Cal. App. 4th at 1552.

In this second step, the Court admits the extrinsic evidence, if any, proffered by each party to aid in interpreting the contract.  *ASP Properties*, 133 Cal.App. 4th at 1266.  If the parties submit no extrinsic evidence, or if the material extrinsic evidence is not in conflict, the Court's construction of the contract is purely a question of law.  *Id*.  If, however, the evidence presents a genuine issue of <u>material</u> fact, that fact issue must be resolved by a jury before the Court can interpret the contract.

//

---

[6]OTN suggests that the Court does not look to extrinsic evidence absent allegations of misrepresentation or fraud.  Transcript of February 1, 2006, hearing.  This contention is not supported by the cases.  California case law clearly directs the Court to consider extrinsic evidence offered by a party to support the party's proffered meaning and/or assess ambiguity.

1

### 1.     The CAA is "ambiguous"

2       Following California law, we first determine whether the CAA is

3  "ambiguous."  We find that it is – *i.e.*, that the CAA is reasonably susceptible to

4  either of the meanings proffered by the parties.

5       When interpreting the potential meaning of the contract we may not

6  consider the sentence on which the parties focus in isolation.

7       [L]anguage in a contract must be construed in the context of that
        instrument as a whole, and in the circumstances of that case, and
8       cannot be found to be ambiguous in the abstract.

9  *Bank of the West v. Superior* Court, 2 Cal 4th 1254, 1265 (1992) (emphasis

10  omitted)  citing *Producers Dairy Delivery Co. v. Sentry Ins. Co.*, 41 Cal.3d 903

11  (1986).

12       Plaintiff urges us to find that the parties intended that Dr. Poulin was

13  personally guaranteeing Virginia Hematology's debt to OTN.  Dr. Poulin, on the

14  other hand, contends that the CAA can be understood only as a contract for credit

15  between Virginia Hematology and OTN for the purchase of oncology supplies.

16  According to Dr. Poulin, he did not personally guarantee Virginia Hematology's

17  debt by signing the CAA.

18       At the hearing on February 1, 2006, the Court asked plaintiff to identify the

19  bases for its position that Dr. Poulin personally guaranteed Virginia Hematology's

20  debt.  Plaintiff stated that the evidence in support of its position that Dr. Poulin

21  personally guaranteed the debt consists of the language of the CAA.  Transcript

22  February 1, 2006, hearing.  When asked whether plaintiff relied on any extrinsic

23  evidence (*i.e.*, evidence outside the four corners of the contract) that the Court

24  should consider for its position, plaintiff conceded that it did not.  *Id*.  Plaintiff

25  added, however, that its position also was supported by the <u>absence</u> of evidence

26  that Dr. Poulin communicated to OTN that he did <u>not</u> intend to personally

27  guaranty the debt and by an "inference" created by an alleged "fact" about the way

28

oncologists generally order oncology supplies.  Without any competent evidentiary support, plaintiff contends that, as a matter of real-world fact, it is generally the physicians themselves, not their staffs or administrators associated with their practices, who place orders for oncology supplies.[7]  Plaintiff argued that this alleged (but unsupported) "fact" supports an inference that Dr. Poulin was the primary beneficiary of the CAA.  *Id.*   As we shall explain, this alleged fact (even if true) – and this line of inferencing – are of no significance for the issues here.

Because plaintiff relies almost entirely on the contract itself, we focus largely on the language of that contract.  For reasons we explain in the next paragraphs, we find that the CAA is reasonably susceptible to the meaning Dr. Poulin proffers.   We also conclude that it would not be transparently unreasonable to ascribe the meaning to the language of the contract that the plaintiff proffers.  It follows that the language is ambiguous.

The critical sentence is poorly worded and could be read in two ways.  We begin by quoting it in full.  "The person signing below personally guarantees that Applicant will pay all amounts due under this Agreement and shall be responsible for such amount being paid."  One rationally accessible interpretation of this sentence is that the person who signs the document personally promises to see to it that the Applicant pays the money it owes.  Under this reading, the "Authorized Person" is not making a personal guarantee at all – but making a promise to do everything he reasonably can to assure that the Applicant honors the commitments it makes pursuant to the terms of the Credit Application and Agreement.

There is a second rationally accessible interpretation of these words if we take into account only the words themselves and ignore the context, both textual

---

[7]In support of its position plaintiff submitted the declarations of Kimberly Bergstrom and John Akscin.  It is not clear that these declarants have reliable personal knowledge or that whatever information they do have is sufficient to support reliable generalizations about oncology practice nationwide.

1    and real-world, in which the words appear.  Under this second interpretation, the

2    person who signs as the "Authorized Person" accepts a personal obligation to pay

3    out of his own funds the debts that the Applicant incurs under the Credit

4    Application and Agreement if the Applicant for any reason fails to pay those

5    debts.  The source of this interpretation, of course, are the words "personally

6    guarantees" and "be responsible for such amounts being paid."

7          In support of Dr. Poulin's interpretation, the sentence on which the parties

8    focus is poorly worded, and, as written, it states that the signatory will "personally

9    guarantee[] that Applicant [Virginia Hematology] will pay all amounts owed under

10   this Agreement."  Said another way, the language of the most important sentence

11   (for these purposes) states that Dr. Poulin will ensure that Virginia Hematology

12   pays its debt.  How he would do that we do not know.  The sentence does not state

13   that the signatory personally guarantees the debt.

14         Additionally, we are required to consider the contract as a whole, and it is

15   clear that the primary (if not entire) thrust of the CAA is to create a line of credit

16   on behalf of Virginia Hematology.  In that regard, the CAA contains *multiple*

17   references to the fact that the agreement is "on behalf" of the entity Virginia

18   Hematology, that the "Applicant" is the entity, and that the signatory is an

19   "authorized representative" of the entity.

20         The agreement also is titled "Credit Application and Agreement."  There is

21   no indication in the title of the agreement that a personal guaranty would be

22   created.

23         Moreover, even if, under certain circumstances, California law permits one

24   signature to bind both the entity and the individual, we find that the fact that there

25   is only one signature line, that the CAA reads "Authorized Person's Signature" in

26   front of that line, and that the CAA asks that authorized person to provide his or

27

28

her *title* all undermine the argument that the parties intended to create two distinct sources of liability and support Dr. Poulin's position.

In support of plaintiff's position, we acknowledge that, despite the fact that the sentence preceding Dr. Poulin's signature is poorly written it does contain the phrase "personally guarantees." Additionally, on the back of the contract under "Credit Investigation" it states, "[y]ou [which is defined as the "Applicant"] also authorize us to investigate the personal credit histories of authorized representatives of the business." Finally, under "Governing Law" the back of the contract states "Applicant <u>and</u> Authorized Person agree to personal jurisdiction in and by the State of California." Poulin Decl., at Ex. A emphasis added. Although none of the quoted statements <u>clearly</u> create a personal guaranty, if other evidence, rules of contract construction, or legal authority were to support that reading, we find that the three quoted statements are reasonably susceptible to the interpretation plaintiff urges. *Falkowski v. Imation Corp.,* 132 Cal.App. 4th 499, 508-9 (1st Dist. 2005) (contract ambiguous where interpretation was plausible although "not a perfect fit").

We find that the contract is ambiguous on its face. Plaintiff, however, has not submitted extrinsic evidence that eliminates this ambiguity or that provides any meaningful support for plaintiff's interpretation. Dr. Poulin, by contrast, submits *extrinsic* evidence in support of his proffered meaning. In his declaration Dr. Poulin testifies that (1) he signed the CAA only as an authorized representative for Virginia Hematology, (2) that he never intended to personally guaranty the debt, and (3) that there were no communications between himself and OTN about the CAA much less about a personal guaranty. Dr. Poulin notes that he wrote "Managing Member" next to his name when he signed the CAA and argues that this supports a finding that he had no intention of assuming responsibility for the debt in his individual capacity.

13

At this juncture, we must admit all the extrinsic evidence and proceed to determine whether plaintiff presents a genuine issue of material fact with respect to the parties' intentions as expressed in the terms of the contract or whether we interpret the contract as a matter of law.

### 2.    There Was No Mutual Intention to Create a Personal Guaranty

At the outset, we must recognize that California law creates two presumptions in favor of a finding that the CAA did <u>not</u> create a personal guaranty by Dr. Poulin of Virginia Hematology's debt.

It is undisputed that, when he signed the CAA, Dr. Poulin was acting on behalf of Virginia Hematology and that plaintiff was aware that Dr. Poulin was acting on behalf of the entity.  Plaintiff argues only that Dr. Poulin was <u>simultaneously</u> acting as an individual.  California law employs a presumption that an agent of a disclosed principal does not bind himself individually absent clear evidence that the parties intended to do so.

> Whether the agent of a disclosed principal binds himself depends upon the intention of the parties, which must be gathered from the facts and circumstances of each particular case.  The <u>presumption</u> in such a case is that <u>it was the agent's intention</u> to bind his principal and <u>not to incur a personal liability</u>; and ordinarily the agent will not be personally bound except upon <u>clear and explicit evidence</u> of an intention to substitute or superadd his personal liability for or to that of the principal.

*S.F. Heringer v. A.G. Schumacher*, 88 Cal. App. 349 (3d Dist. 1928) emphasis added.[8]

---

[8] *Heringer* goes on to say, "[b]ut it is the disclosed intention which governs, not any intention hidden in the mind of the agent, and accordingly the agent may render himself personally, liable, although this is contrary to his actual intention if he has in fact bound himself according to the terms of the contract."  88 Cal. App. at 353.

For the reasons stated in the text, we find that the "terms of the contract" do not bind Dr. Poulin personally.

Additionally, California provides that agreements to guaranty the debt of another are "strictly construed so as not to impose a burden not contained in or clearly inferable from the language of the contract." *Airlines Reporting Corp., v. U.S. Fidelity and Guaranty Co.*, 31 Cal.App.4th 1458 (6th Dist. 1995). *See also, U.D. Switzer v. A.F. Baker*, 95 Cal. 539 (1892) ("We cannot infer an agreement to pay the debt of another from such doubtful language.").

Given these two presumptions against the imposition of individual liability in circumstances such as these, to survive summary judgment plaintiff must proffer evidence from which a trier of fact reasonably could conclude that OTN had proven by "clear and explicit evidence" that both OTN and Dr. Poulin mutually intended to impose personal liability. We emphasize that California law requires that plaintiff demonstrate that that inference of mutual intent be <u>clear</u>. Plaintiff has presented no evidence from which an objective trier of fact could reasonably conclude that it is <u>clear</u> that this language, in context, was intended by <u>both</u> parties to impose a personal obligation on Dr. Poulin.

As noted, when interpreting what the parties intended by the words used in the contract, we must consider the contract as a whole as well as the circumstances surrounding its making -- and not simply the language highlighted by the parties. Cal. Civ. Code §1641. *See also, Heringer*, 88 Cal. App. at 353 ("if it can, upon the whole instrument, be collected that the true object and intent of it are to bind the principal and not to bind the agent, courts of justice will adopt that construction of it, however informally it may be expressed").

Reading the CAA as a whole, we find that the contract leaves the overwhelming impression that "the true object and intent of it" was to create a line of credit for Virginia Hematology, to impose a duty only on the Applicant, Virginia Hematology, and that the signatory was acting only in his capacity as an "authorized representative" of that entity. *Heringer*, 88 Cal. App. at 353.

15

1       The contract is titled "Credit Application and Agreement" and the

2  "Applicant" is clearly defined as Virginia Hematology.  Poulin Decl., at Ex. A

3  emphasis added.  There is no reference to a "guaranty" other than the poorly

4  worded sentence upon which plaintiff relies.

5       The first reference to the signatory reads, "[s]ignatory below represents he

6  or she is a principal owner or an officer of the company with authority to enter into

7  this contractual agreement on behalf of Applicant."   Poulin Decl., at Ex. A

8  (emphasis added).  The next reference to the signatory states

> 9  [a]ny person signing below on behalf of a business entity attests that
>   the buyer is a valid business entity and that such person is authorized
> 10  to enter into this Agreement on behalf of the buyer.  By signing
>   below, Applicant agrees to the terms set forth in the Commercial
> 11  Credit Agreement . . ..

12  Poulin Decl., at Ex. A emphasis added.  These sentences clearly indicate that the

13  signatory is signing as an agent on behalf of the Applicant entity and the signature

14  is viewed as that of the Applicant.

15       Following these statements is the poorly written sentence which literally

16  states that the signatory will "personally guarantee" that the Applicant pays its

17  bills.  This reading, although peculiar, is somewhat consistent with the prior

18  statement that the signatory is "attesting" that the entity is a valid business.

19  Following that sentence is a signature line.  The contract consists of a form

20  provided by OTN, and OTN's form contract provides only one signature line.  That

21  signature line is preceded by the phrase, "Authorized Person's Signature" and is

22  succeeded by a request for the signatory's title.  This further supports a finding that

23  the dominant import of the contract is that the signatory is signing as an agent on

24  behalf of the entity.

25       In support of his position that he had no intent to be personally liable on the

26  contract, Dr. Poulin points out that next to his name on the contract he wrote

27  "Managing Member."  While it is true that the placement by an agent of his title

28

after his name does not necessarily prevent a finding that the agent is personally liable on the contract, the addition of "words *descriptio personae*" "is significant in connection with other facts." *Heringer*, 88 Cal.App. at 353. We note that, here, Dr. Poulin did not add his title arbitrarily. <u>OTN</u> specifically requested that he provide it, and the request was consistent with the prime import of the contract – *i.e.*, that the signatory had the authority under law to bind the Applicant.[9]

Other than the word "personally" in one poorly drafted sentence, there is no indication on the front of the document that the signatory is acting in his <u>individual</u> capacity. Dr. Poulin could not reasonably have expected that he was obligating himself individually.

This theme that the signatory has signed on the Applicant's <u>behalf</u> is continued on the second page of the CAA. For example, the CAA defines "you" and "your" as "the <u>Applicant</u> that signs the Application *or* <u>on whose behalf</u> the Application is signed." Plaintiff contends that the CAA defines "you" and "your" as both the Applicant <u>and</u> the signatory. Opposition at 16. This is clearly not correct.

Moreover, if the parties intended to create a personal guaranty of the debt one might expect there to be some reference to OTN's ability to seek payment from the guarantor in the section of the contract titled "Default/Collection Costs." There is none.

We have identified only two statements on the back of the contract that conceivably could support plaintiff's position. The first, the statement that the Applicant also authorizes OTN "to investigate the personal credit histories of authorized representatives of the business," does not clearly manifest an intention to create a personal guaranty. First, it again uses the phrase "authorized

---

[9]Compare, *Sebastian Int'l, Inc. v. Peck*, 195 Cal.App. 3d 803 (2nd Dist. 1987) (apart from the signature line the guaranty contained "no reference" to the agent's relationship with its principal).

representatives" rather than "guarantor" or some other clear indication that OTN intends to refer to the signatory as an <u>individual</u>.  Second, it obtains permission to investigate the credit history, not just of the signatory, but of multiple "authorized representative<u>s</u>."  OTN cannot argue that authorized representatives other than Dr. Poulin, who did not sign the CAA, personally guaranteed the debt.  Accordingly, this language does not clearly and explicitly evidence an intent to create a personal liability on behalf of the signatory.  We also note, in defendant's favor, that OTN has not even contended that it conducted a credit check of Dr. Poulin personally.

The second statement, "Applicant <u>and</u> authorized person agree to personal jurisdiction in and by the State of California" is insufficiently direct and explicit to overcome the presumption against creating personal liability on behalf of an agent. A statement on the back of a contract, near the end of a full page of "fine print," would have to expressly state that it was creating a personal guaranty and be highlighted visually in order to support a contention that an entity's agent was intending to accept personal liability for the entity's debt.  We also note that this statement is not inconsistent with Dr. Poulin's position that there is no guaranty.  If an entity's representative committed a tort, such as fraud, in connection with the contract, plaintiff could sue the signatory as an individual for his tort.  *Heringer*, 88 Cal. App at 353; Cal. Civ. Code §2343(3).  The request that the signatory subject himself to personal jurisdiction in California, therefore, is not rendered superfluous if we find that the CAA created no guaranty.

Absent extrinsic evidence to the contrary, the Court will adopt the interpretation that is "more consistent with the articulated purposes of [the contract]."  *Cf., Falkowski*, 132 Cal. App. 4th at 510 (where neither party provided extrinsic evidence about intent, the court relied on the language of the contract, found both interpretations an imperfect fit, and adopted the construction that was more consistent with the overall purpose of the contract).  One poorly written

sentence above the signature line and two sentences whose specific purpose is unclear are insufficient to overcome the presumptions against imposition of personal liability in circumstances such as these recognized under California law.

Significantly, there is no extrinsic evidence in the record that could make OTN's interpretation objectively reasonable. Instead, the only relevant extrinsic evidence supports Dr. Poulin's contention that the parties' mutual intention was to impose an obligation only on Virginia Hematology.

Dr. Poulin submits his declaration in which he testifies that,

> [a]t the time I signed the Credit Application, I believed it to be only an application for the extension of credit to [Virginia Hematology]. No other communication regarding the nature of the Credit Application was exchanged between myself and any representative of OTN. . . . I did not speak with any employee or agent of OTN regarding the Credit Application. . . . I never received any communication from OTN regarding the nature of the Credit Application and OTN's intent to secure a personal guarantee from me. In fact, I was not aware that OTN believed that it had a personal guarantee from me for [Virginia Hematology's] alleged debt until I received the summons and complaint from OTN. At no time was I made aware, told or informed that OTN sought my personal guarantee on the Credit Application. I never consented, at any time, either orally or in writing, to give OTN a personal guarantee on [Virginia Hematology's] alleged debt to OTN or any other debt.

Poulin Decl., at ¶¶14-20.

These unequivocal statements by Dr. Poulin are undisputed by plaintiff. Plaintiff does not present any evidence that any agent of OTN ever advised Dr. Poulin that OTN sought a personal guaranty or discussed the nature of the CAA with Dr. Poulin in any manner.[10] In fact, plaintiff submits no extrinsic evidence even that it was <u>OTN</u>'s intent to create a personal guaranty -- much less that Dr.

---

[10]The only declarant proffered by plaintiff who had any direct contact with Virginia Hematology or Dr. Poulin was Ms. Moore. Declaration of Allessaundra Moore in Opposition to Motion for Summary Judgment, filed January 9, 2006 ("Moore Decl."). Ms. Moore indicates that she had personal contact with defendants related to Virginia Hematology's account; however, most, if not all, of this contact seems to have occurred <u>after</u> Dr. Poulin signed the CAA. Nowhere does Ms. Moore state that she had any communications with Dr. Poulin prior to his signing the CAA. Plaintiff confirmed on the record that it knows of no evidence that the parties ever communicated about a personal guaranty.

1   Poulin reasonably should have understood that OTN intended to do so.  OTN
2   neither submits evidence that it ever conducted an investigation of Dr. Poulin's
3   personal credit prior to entering the CAA nor identifies any other acts or
4   circumstances that would support a finding that OTN thought it was obtaining a
5   personal guaranty.

6          Plaintiff argues that Dr. Poulin has submitted no evidence that he
7   communicated his intention <u>not</u> to be personally liable.  <u>Plaintiff</u> has the burden to
8   establish, <u>clearly</u>, that the parties mutually intended to create a personal liability.
9   It is not defendant's burden to prove a negative.  Certainly defendant cannot be
10  required to negate an obligation that is contrary to two presumptions of contract
11  construction,  not clearly supported by the contract language itself, and
12  unsupported by extrinsic evidence.  There is no genuine issue of material fact with
13  respect to whether the parties discussed a personal guaranty in connection with the
14  making of the CAA.  They did not.  No rational trier of fact could conclude that
15  OTN <u>expressed</u> an intention that the sentence in the credit application would
16  create a guaranty.  OTN has provided no evidence that could support a finding
17  that, in these circumstances, Dr. Poulin acquired some duty to actively
18  communicate to OTN that he was <u>not</u> assuming a personal obligation.  In order to
19  create such a duty OTN would have had to take substantial steps to make it very
20  clear to Dr. Poulin that the document he was signing not only created a credit
21  account for Virginia Hematology, but also imposed a personal liability on himself.

22         To the extent that conduct subsequent to entry of the contract is relevant to
23  determining the parties' intent at the time they entered the contract, we note that
24  the evidence also is uncontradicted that at no time prior to the filing of this lawsuit
25  -- when OTN was discussing Virginia Hematology's rising upaid debt and
26  negotiating payment plans signed by Dr. Poulin -- did OTN indicate to Dr. Poulin

27

28

that if Virginia Hematology did not pay its debts Dr. Poulin would have to pay them personally.  Poulin Decl., at ¶18.

Plaintiff also argues that Dr. Poulin was primarily responsible for ordering the oncology supplies and that this supports a finding that the CAA was entered primarily for his benefit.  First, plaintiff's contention that Dr. Poulin ordered the supplies is based on testimony of declarants without personal knowledge of the practices at Virginia Hematology and with no personal contact with Dr. Poulin.  Second, Virginia Hematology has employed three physicians over its existence, at least one of whom was not an owner.  Under plaintiff's logic, the CAA was equally for Dr. Saman's benefit during his tenure with Virginia Hematology.  It would be irrational to use this "benefit" as a justification for imposing liability on Dr. Poulin, but not on Dr. Saman, simply because Dr. Poulin also was a representative of Virginia Hematology and, therefore, was authorized to sign the CAA.  If an agent other than Dr. Poulin had signed the CAA, Dr. Poulin (under plaintiff's theory) would still be responsible for ordering the supplies his patients need.  Therefore, even if plaintiff's witnesses had personal knowledge that Dr. Poulin placed the orders for the oncology supplies, that fact would have no significant bearing on whether the CAA imposed liability on Dr. Poulin personally.

Finally, we note that if, at this juncture, the ambiguity were not otherwise resolved, California rules of contract construction would require us to construe unresolved ambiguity against the drafter -- in this case, OTN.  *Tahoe Nat'l Bank v. Phillips*, 4 Cal. 3d 11 (1971).

We find that the facts material to determination of the parties' expressed intentions are undisputed.  In light of the literal meaning of the relevant sentence as written, the overall purpose of the CAA, the repeated use of language in the CAA that indicates Dr. Poulin was operating as a representative of the entity and not an individual, undisputed extrinsic evidence that Dr. Poulin never intended to

personally guarantee Virginia Hematology's debt, and undisputed extrinsic evidence that OTN never communicated its intention to create a personal guaranty and did not conduct a credit check of Dr. Poulin personally, we find that, as a matter of law, the CAA does <u>not</u> create a personal guaranty by Dr. Poulin.

### D.   Were There Modifications to the Agreement That Exonerated Dr. Poulin from Any Obligation under the Credit Application?

Because we grant defendant's motion and hold that, as a matter of law, the CAA does not create a personal guaranty by Dr. Poulin of Virginia Hematology's debts, we need not address this issue.

### E.   Plaintiff's Counter Motion for Summary Judgment

Although it was improperly presented, the Court considered plaintiff's counter motion for summary judgment on the merits.  Plaintiff's motion is DENIED for the reasons stated in section C, *supra*.

## II.   Request for Leave to Amend the Complaint

On January 9, 2006, plaintiff filed its request for leave to file an amended complaint containing allegations that, among other things, Dr. Poulin is the alter ego of Virginia Hematology and should be personally responsible for Virginia Hematology's debt on that basis.  Plaintiff also seeks to add allegations that Dr. Poulin created a second entity, VHO, in order to avoid liability under the CAA. According to plaintiff, Dr. Poulin created VHO and fraudulently conveyed Virginia Hematology's assets to VHO -- thus rendering Virginia Hematology judgment proof.  Plaintiff also alleges that VHO is liable for Virginia

Hematology's debt under the CAA as Virginia Hematology's successor.  Plaintiff's request is governed by F.R.C.P. 15.[11]

Motions to amend the pleadings are liberally granted.  F.R.C.P. 15(a) ("leave shall be freely granted when justice so requires"); *U.S. v. Webb*, 655 F.2d 977, 979 (9th Cir. 1981).  In deciding whether justice requires granting leave to amend, the Court will consider factors such as the presence or absence of undue delay, bad faith, dilatory motive, undue prejudice to the opposing party, and futility of the proposed amendment.  *Webb*, 655 F.2d at 980.

Defendants oppose plaintiff's request.

For the reasons stated below, we GRANT plaintiff's Request *subject to the conditions* noted below.

We address defendants' objections and our conditions for amendment in the paragraphs that follow.

### A.   <u>Defendants Argue That Plaintiff Unduly Delayed</u>

Defendants complain that plaintiff knew that Dr. Poulin had created VHO before plaintiff filed the original complaint and, therefore, that OTN has unduly delayed in seeking to amend the complaint to add these allegations.

It is true Dr. Saman told OTN "that Dr. Poulin was changing his tax ID and also his name to VHO, PLLC" before plaintiff filed the original complaint.  Moore Decl., at ¶17.  However, OTN learned this information on June 23, 2005.  *Id.* OTN filed the original complaint on June 30, 2005.  The evidence indicates that OTN learned that Dr. Poulin might somehow be altering Virginia Hematology's corporate form only one week before it filed the original complaint.  One week

---

[11]Plaintiff indicates that it is seeking to "supplement" its complaint pursuant to F.R.C.P. 15(d).  Request to Amend at 6.  Rule 15(d) is used to add allegations relating to facts that *occurred after* the filing of the original complaint. Most of the allegations in plaintiff's proposed First Amended Complaint pertain to conduct that took place <u>before</u> plaintiff filed the original complaint.  Accordingly, plaintiff's request is primarily a request to amend under Rule 15 (a).

would not provide sufficient time to investigate and to identify possible causes of action related to the recently learned information.

Moreover, the primary purpose for denying leave to amend for undue delay is prejudice to the defendants. Defendants do not contend that allowing amendment at this juncture would be prejudicial. As of January 9, 2006, when plaintiff filed its Request to Amend, this action was only six months old, and the parties had conducted little, if any, discovery. Absent some particularized showing of prejudice, we decline to deny plaintiff's request on the ground that there was undue delay.

**B.    Defendants Argue That Leave to Amend Is Inappropriate Where, as Here, a Motion for Summary Judgment Is Pending.**

According to defendants, when a motion for summary judgment is pending at the time plaintiff seeks leave to amend, the Court must deny plaintiff's Request to Amend unless plaintiff presents "substantial and convincing evidence" supporting the proposed amendments. Alternatively, even if plaintiff is not required to present such evidence in support of its amendments, defendants argue that the fact that a motion for summary judgment is pending is a factor that weighs against granting leave to amend.

The Ninth Circuit has found it within the trial court's discretion to grant leave to amend after a motion for summary judgment has been filed. *Ferris v. Santa Clara County*, 891 F.2d 715 (9th Cir. 1989). However, district court cases within the Ninth Circuit do indicate that where there is a summary judgment motion pending, leave to amend may be denied when the plaintiff has not made a "substantial showing" to support the amendment. *Maldonado v. City of Oakland*, 2002 WL 826801, *4 (N.D. Cal) citing Schwarzer, Tashima & Wagstaffe, *Federal Civil Procedure Before Trial*, §8:420.1 (2002 ed.).

24

1   We conclude that, in this Circuit, whether there is a summary judgment
2   motion pending is a factor the Court may consider in assessing whether there has
3   been undue delay and/or prejudice to the defendant.  Typically, summary judgment
4   motions are brought after the parties have substantially developed the case through
5   discovery.  Under those circumstances (which are not present here) the Court
6   should take special care to ensure that plaintiff is not abusing the system and that
7   defendants will not be unduly prejudiced.

8   Plaintiff cites case law from the Seventh Circuit to the effect that a party
9   seeking to amend after a motion for summary judgment is pending must present
10  "substantial and convincing evidence" supporting the proposed amendments.  We
11  are not governed by the Seventh Circuit.  Additionally, *Cowen v. Bank of United*
12  *Texas,*, 70 F.3d 937 (7th Cir. 1995), the case on which defendants most heavily
13  rely goes on to say that this "statement [is not] presented as a *rule* to confine the
14  district court's discretion."  *Cowen*, 70 F.3d 937 emphasis in original.  *Carey v.*
15  *Beans*, 500 F.Supp. 580, 582 (D.C.Pa., 1980), states that the purpose of this 'rule'
16  is to prevent prejudice to the opposing party.  In our view, cases in the Seventh
17  Circuit are little more than a directive to trial courts to more closely scrutinize
18  whether amendment is appropriate after the parties have conducted a great deal of
19  discovery and expended substantial resources developing the case as originally
20  framed.

21  In the case before us, plaintiff notified the Court of its intention to amend
22  the complaint before defendant filed his summary judgment motion.  See,
23  Transcript December 1, 2005, case management conference.  This Court
24  established a briefing schedule for this Request to Amend that would overlap with
25  the briefing scheduling for defendant's Motion.  This is not a case in which
26  plaintiff saw defendant's motion for summary judgment, saw the "writing on the
27  wall," and then sought to amend to circumvent the inevitable.  Additionally, in this

28

25

case, the value of defendant's Motion will not be undercut by the proposed amendments because our ruling that plaintiff cannot, as a matter of law, sustain its claim that the CAA created a personal guaranty by Dr. Poulin of Virginia Hematology's debts still stands and that claim must be eliminated.  Plaintiff's proposed amendments do not affect our resolution of the merits of the motion for summary judgment.

Finally, the central concern of all these inquiries is prejudice to the defendants and, here, defendants have identified no prejudice.

### C.      Defendants Argue That Addition of VHO Would Be Futile

Before we address whether the addition of VHO as a defendant would be futile, we note that plaintiff has <u>not</u> directly named VHO as a party in the proposed First Amended Complaint.  If plaintiff intends to sue VHO as the successor to Virginia Hematology, plaintiff must directly name VHO as a party to the case.

Defendants argue that it would be futile, in any event, to add VHO as a defendant because the Court cannot secure jurisdiction over VHO.  According to defendants, plaintiff cannot demonstrate that VHO has minimum contacts in California sufficient to satisfy due process.  Defendants have not addressed Ninth Circuit law on this issue.

In the Ninth Circuit, where plaintiff makes a *prima facie* showing of alter ego or agency, plaintiff can attribute the minimum contacts of one party to those of another in order to obtain personal jurisdiction over the second party.  *Harris-Rutsky & Co. Ins. Services, Inc. v. Bell & Clements Ltd.*, 328 F.3d 1122 (9th Cir. 2003).

> It is well-established that a parent-subsidiary relationship alone is insufficient to attribute the contacts of the subsidiary to the parent for jurisdictional purposes. . . .Two exceptions to that general rule exist, however - a subsidiary's contacts may be imputed to the parent where the subsidiary is the parent's alter ego, or where the subsidiary acts as the general agent of the parent.

26

To satisfy the alter ego exception . . . the plaintiff must make out a prima facie case "(1) that there is such unity of interest and ownership that the separate personalities [of the two entities] no longer exist and (2) that failure to disregard [their separate identities] would result in fraud or injustice." . . . The plaintiff must show that the parent exercises such control over the subsidiary so as to "render the latter the mere instrumentality of the former."

To satisfy the agency test, the plaintiff must make a prima facie showing that the subsidiary represents the parent corporation by performing services "sufficiently important to the [parent] corporation that if it did not have a representative to perform them, the [parent] corporation . . . would undertake to perform substantially similar services." . . . The agency test permits the imputation of contacts where the subsidiary was "either established for, or is engaged in, activities that, but for the existence of the subsidiary, the parent would have to undertake itself."

*Harris-Rutsky*, 328 F.3d at 1134-35.[12]  *Harris-Rutsky* also found that where the record is insufficiently developed for the Court to make this assessment, plaintiff may obtain jurisdictional discovery.

Although *Harris-Rutsky* involved a parent company and its subsidiary, we see no reason to limit the doctrine to that situation.  *Accord, Las Palmas Assoc. v. Las Palmas Center Assoc.*, 235 Cal. App. 3d 1220 (2nd Dist 1992) (California courts will disregard the corporate form between sister corporations where its clear that those involved operate as one "single enterprise").

Plaintiff has not responded to defendants' argument that addition of VHO would be futile.  See, Reply.  Nonetheless, there is enough evidence suggestive of plaintiff's contention to permit plaintiff to plead that VHO is only a shell for taking over Virginia Hematology.  Dr. Poulin essentially states that he created VHO as a shell for the continuation of Virginia Hematology in the event that Dr. Needleman created problems.  "VHO . . . was formed as the company through which proper

---

[12]Defendants argue that the law of Virginia, not California, governs plaintiff's alter ego claim.  Because defendants have not addressed *Harris-Rutsky* they do not address whether it is nonetheless appropriate to apply the California alter ego standard with respect to the jurisdictional question.  However, as explained in section D.1 *infra*, we find, preliminarily, that the standard for finding alter ego and piercing the corporate veil in Virginia is essentially the same as the standard in California.

patient care could continue should [Virginia Hematology] be deadlocked, be dissolved by Dr. Needleman, or otherwise compromised by Dr. Needleman." Poulin Second Decl., at ¶46.

There also is evidence in the record that, at this time, VHO has little or no operations and no office space apart from Virginia Hematology.  Declaration of David J. Cook in Opposition to Motion for Summary Judgment, filed January 9, 2006, ("Cook Decl.") at Ex. C; Declaration of Ronald Poulin, filed January 17, 2006, at ¶49 ("Second Poulin Decl.").  Although there is reason to think that Virginia Hematology assigned Dr. Saman's employment contract to VHO, Dr. Saman has left VHO (and/or Virginia Hematology), and there is no evidence in the record that VHO has treated any patients.  Second Poulin Decl., at ¶18; Cook Decl., at Ex. D.  In the lawsuit against Dr. Saman, defendants refer to VHO as an "affiliate" of Virginia Hematology.  Cook Decl., at Ex. D.

Thus there is evidentiary and circumstantial support for plaintiff's allegation that VHO is legally indistinguishable (for purposes of this case) from Virginia Hematology and possibly from Dr. Poulin.

In a separate section of their Opposition, defendants argue that plaintiff cannot satisfy the second alter ego requirement -- a showing of injustice.  While the scope of this requirement is somewhat unclear, plaintiff has alleged that defendants have engaged in fraudulent conveyances and that Dr. Poulin has intentionally transferred assets to VHO in an attempt to avoid Virginia Hematology's contractual obligations to OTN.  Evidence in the record could support an inference that defendants attempted to assign Dr. Saman's employment contract to VHO and that at some point Dr. Poulin "resigned" from Virginia Hematology, although he now denies this.  VHO was formed at a time that Virginia Hematology allegedly owed large sums to plaintiff – and there is reason to believe that VHO always has been assetless and judgment proof.  In this setting,

28

we would abuse our discretion if we refused to permit plaintiff to plead that honoring the formal separateness of Virginia Hematology and VHO would result in an injustice.

It follows that we cannot conclude that this Court could not assert jurisdiction over VHO.  Plaintiff must be permitted to plead that Virginia Hematology's contacts with California should be attributed to VHO.

### D.   Defendants Argue That Addition of Plaintiff's Alter Ego Claim Would Be Futile

Defendants argue that plaintiff's proposed amendments relating to alter ego are governed by Virginia law, as opposed to California law, and that the standard for demonstrating alter ego in Virginia is more stringent than in California.[13] Furthermore, according to defendants, plaintiff cannot satisfy the standard in either state, and, therefore, amendment would be futile regardless of which state's law applies.

### 1.   Whose Law Applies to Plaintiff's Alter Ego Claims?

Defendants argue that Virginia law, not California law, applies to plaintiff's alter ego claim(s).  Defendants cite a decision from Illinois applying Illinois' choice of law rules.  Defendants also cite a California case that supports application of a doctrine to the effect that the laws of the state in which a corporation is incorporated should govern that corporation's "internal affairs." Defendants do not discuss California's choice of law rules.  Plaintiff completely fails to address defendants' choice of law argument.

---

[13]Defendants do not argue that Virginia law applies to plaintiff's fraudulent conveyances claim.  Therefore, we assume that defendants concede that California law applies to that claim.

1    A federal court sitting in diversity applies the choice of law rules of the

2    forum state. *Liew v. Official Receiver and Liquidator,* 685 F.2d 1192 (9th Cir.

3    1982). Accordingly, we must analyze defendants' choice of law argument under

4    California law.[14] The test crafted by California courts is referred to as a

5    "governmental interest" test. Under this test, we first determine whether the

6    competing states' laws differ. If the laws of the competing states do not differ,

7    there is no harm to Virginia if the Court applies California law and the inquiry is

8    over. If, on the other hand, the laws of the competing states do differ, we identify

9    which interests, if any, of each state could be impaired if we did not apply that

10   state's laws. If both states have interests that would be impaired if its laws were

11   not applied, we conduct an analysis of "comparative impairment" to determine

12   which state has the greater interest in having its laws applied. *Liew*, 685 F.2d aat

13   1196.

14       Defendants argue that the "internal affairs doctrine" compels application of

15   Virginia law. Opposition at 19 citing *State Farm Mut. Auto. Ins., Co. v. Superior*

16   *Court*, 114 Cal.App. 4th 434 (2003). Pursuant to *State Farm*, the internal affairs

17   doctrine is

18       a conflict of laws principle which recognizes that only one State
         should have the authority to regulate a corporation's internal affairs –
19       matters peculiar to relationships among or between the corporation
         and its current officers, directors, and shareholders – because
20       otherwise a corporation could be faced with conflicting demands.

21       "Internal affairs" include steps taken in the course of the original
         incorporation . . . the adoption of by-laws, the issuance of corporate
22       shares, the holding of directors' and shareholders' meetings, . . . the
         declaration and payment of dividends and other distributions, charter
23       amendments, mergers, consolidations, and reorganizations, the
         reclassification of shares and the purchase and redemption by the
24       corporation of outstanding shares of its own stock.

25

26

27       [14]The CAA contains a choice of law provision for disputes relating to the contract. No
28   party argues that this provision governs an alter ego claim.

*State Farm*, 114 Cal.App. 4th at 442. *State Farm* does not involve an effort by an underline(outsider) to pierce the corporate veil based on alter ego. Moreover, it is not clear to us that an "alter ego" claim such as that asserted by plaintiff involves "internal" affairs of the corporation, as opposed to affairs "external" to the corporation. See, Note, Piercing the Corporate Law Veil: the Alter Ego Doctrine Under Federal Common Law, 95 Harv. Law Rev. 853, 862-863 (1982) (suggesting corporate veil issue may be "external").

Most significantly, defendants have presented no authority for the position that the "internal affairs doctrine" underline(replaces) the traditional "governmental interest" test. Absent authority to the contrary, it is our view that the internal affairs doctrine is a product of the notion that a state has a substantial interest in governing the internal affairs of its corporations. Rather than replacing the traditional test, this doctrine simply relates to the second and third step of our analysis -- where we would identify the competing state's interests and assess their relative weight. This conclusion is consistent with cases from our District Court (and those from other jurisdictions) that support a view that a state has a "substantial interest in determining whether to pierce the corporate veil of one of its corporations." *E.g., Sunnyside Development Co., LLC v. Opsys, Ltd. et al*, 2005 WL 1876106, *3 (N.D. Cal). We are aware of no Ninth Circuit or California cases directly discussing choice of law in an underline(alter ego) case.

Because neither party has adequately briefed the issue, we refrain from ruling at this time. We make a preliminary finding, however, that the standard applied to determine an alter ego claim appears to be essentially the same under California and Virginia law. Moreover, even if Virginia law is more stringent than California law on this subject, defendants have not persuaded us that plaintiff's allegations and/or the record are insufficient to meet that standard at the underline(pleading) stage.

1   Both Virginia and California consider piercing the corporate veil to be an

2   extraordinary remedy. *Sonora Diamond Corp., v. Superior Court*, 83 Cal.App.4th

3   523, 539 (5th Dist. 2000); *Dana v. 313 Freemason*, 266 Va. 491 (2003).

4   California courts state that there is no specific "litmus test" for identifying

5   when an individual is the alter ego of an entity but that the facts must support two

6   general requirements: (1) that there is such unity of interest and ownership that the

7   separate personalities of the corporation and the individual (or the two

8   corporations) no longer exist and (2) that failure to disregard their separate

9   identities would result in fraud or injustice. *Mesler v. Bragg Mngmt Co.*, 39 Cal.

10  3d 290 (1985); *Sonora*, 83 Cal.App.4th at 538.

11  California courts emphasize that the alter ego determination is very fact

12  specific.  Some of the factors that California courts consider when assessing

13  whether there is the requisite "unity of interest" include: inadequate capitalization,

14  commingling of funds and other assets, holding out by one entity that it is liable

15  for the debts of the other, identical equitable ownership, use of the same offices

16  and employees, use of one as a mere conduit for the affairs of the other, disregard

17  of corporate formalities, lack of segregation of corporate records, and identical

18  directors and officers. *VirtualMagic Asia, Inc., v. Fil-Cartoons, Inc.*, 99 Cal.

19  App.4th 228, 245 (4th Dist. 2002).  When sister corporations are involved

20  California also recognizes the "single enterprise rule" and will disregard the

21  corporate form between "sister" corporations where it is clear that the entities

22  involved operate as one single enterprise. *Las Palmas Assoc.*, 235 Cal.App.3d

23  1220.

24  Virginia courts have articulated their standard slightly differently.  The test

25  for alter ego in Virginia has required the court to find: (1) that the corporate entity

26  was the alter ego, alias, stooge, or dummy of the individuals sought to be charged

27  personally and (2) that the corporation was a device or sham used to disguise

28

wrongs, obscure fraud, or conceal crime. *Wigand v. Wilkes and WHRO*, 2004 WL
1939074, *2 (Va. Cir. Ct.). Defendants contend that the test in Virginia is more
stringent than the test in California and, more specifically, that in Virginia plaintiff
must prove a "legal wrong" and that this means something stronger than
"injustice." Opposition at 19-21. See also, *Spacenet, Inc. v. American Ag. Comm.
Systems, Inc.*, 2005 WL 3416644 (E.D. Va) ("it is mandatory that Plaintiff allege a
wrong, fraud or crime"). Although the words "fraud" and "crime" are more precise
than the term "injustice" found in the California standard, recent cases from the
Virginia Supreme Court suggest that the standards are, in reality, the same. In
2003 the Virginia Supreme Court articulated the standard for finding alter ego this
way: "[p]iercing the corporate veil is justified when the unity of interest and
ownership is such that the separate personalities of the corporation and the
individual no longer exist and to adhere to that separateness would work an
injustice." *Dana*, 266 Va. 491; *C.F. Trust, Inc. v. First Flight Ltd Partnership*,
266 Va. 806 (2003)**.** In these pronouncements the Virginia Supreme Court did not
purport to change Virginia's standard. It appears that the court simply articulated a
"short hand" for the standard already in use, indicating that the terms "fraud" and
"crime" are examples of the more general term "injustice." This "short hand"
articulation is virtually identical to California's standard.

Moreover, Virginia courts, like California courts, view the alter ego analysis
as very fact specific. *Wigand*, 2004 WL 1939074, *2.

Defendants also argue that Virginia courts are less sympathetic than
California courts to alter ego claims in contract cases, where the complaining
party's risk was part of the bargain, than in tort cases where "third parties" are
hurt. Defendants assert that Virginia courts require plaintiff in an alter ego action
based on contract to demonstrate that the defendant(s) made a misrepresentation in
connection with the contract. Opposition at 20 citing *Spacenet*, 2005 WL

3416644.  *See also, Perpetual Real Estate Serv., v. Michaelson Properties, Inc.*, 974 F.2d 545 (4th Cir. 1992).

Although we have not found California cases that articulate this exact point, California courts have stated that the "injustice" requirement is not satisfied by 'difficulty in collecting a debt.'  *Sonora*, 83 Cal.App.4th at 539; *VirtualMagic*, 99 Cal.App.4th at 245.  Instead, plaintiff must provide evidence of "bad faith."  In our view, both Virginia and California will not pierce the corporate veil for a mere breach of contract.  Instead, both states require some showing of bad faith or wrongdoing.  We cannot say, at this juncture, that Virginia law is materially "more stringent" than California law.

Because the parties have not adequately briefed the issue and because it is our view that both states apply essentially the same standard, we do not address the second and third steps of California's choice of law analysis – what interests would be impaired and comparative impairment.

### 2.    Has Plaintiff Alleged Elements and Facts That Would Support a Claim for Alter Ego?

Plaintiff's proposed amendments ask the Court to disregard the corporate form with respect to two relationships.  Plaintiff argues that Dr. Poulin is the alter ego of Virginia Hematology and that VHO is the alter ego (successor) of Virginia Hematology.[15]  We address the proposed allegations with respect to each.

As previously stated, under both Virginia and California law there are two general requirements to satisfy an alter ego claim.  First, plaintiff must allege facts that would support a finding that the "unity of interest and ownership is such that the separate personalities of the corporation and the individuals no longer exist."  *Dana*, 266 Va. 491 (2003); *Mesler,* 39 Cal.2d 290 (1985).  Second, plaintiff must

---

[15]It is unclear whether plaintiff contends that VHO and Dr. Poulin are alter egos.

allege facts that would support a finding that "adher[ing] to that separateness would work an injustice." *Id*.

Defendants argue that plaintiff has not alleged facts that would satisfy either requirement and that plaintiff cannot show the requisite "injustice" because difficulty collecting a debt does not satisfy that standard and plaintiff has alleged no "legal wrong." Plaintiff has not responded to defendants' argument.

This case is still at the pleading stage. In our view, plaintiff's proposed allegations and the record before us are sufficient, at this stage, to support amendment of the complaint.

For the reasons stated in our discussion of whether the Court can obtain jurisdiction over VHO, the record more than adequately supports an allegation that Virginia Hematology and VHO are a "single enterprise" and, therefore, satisfies the "unity of interest" requirement as to VHO.

Although it is somewhat of a closer question with respect to Dr. Poulin we think the record and plaintiff's allegations are sufficient, at this stage, to support an inference of the requisite unity of interest between Dr. Poulin and Virginia Hematology. At this juncture, plaintiff merely has to allege a colorable claim. Plaintiff does not have to prove the claim. The allegations and the record arguably support a finding that Virginia Hematology, VHO, and Dr. Poulin constitute a single enterprise directed by Dr. Poulin.

In their "Verified Bill of Complaint" in the *Saman* litigation, defendants state "Virginia Hematology Oncology, PLLC, assigned the [employment] Agreement to VHO, PLLC, an affiliated entity, in that both corporations are controlled by Poulin, both corporations have performed or do now perform specialty medical services . . ., and Poulin is an owner of both corporations." Declaration of David J. Cook, Esq. in Support of in [sic] Reply to Opposition to

OTN's Motion for Leave to Amend Complaint, filed January 19, 2006, ("Second Cook Decl.") at Ex. C at 4.

Additionally, plaintiff alleges that Dr. Poulin created VHO and transferred Virginia Hematology's assets to it in order to avoid liability under the CAA. Evidence in the record could support a finding that VHO is nothing but a shell created by Dr. Poulin.  Second Poulin Decl., at 40-49.  The record also indicates that Dr. Poulin caused Dr. Saman's employment contract to be transferred from Virginia Hematology to VHO.  Second Cook Decl., at Ex. C.

We further note that apparent inconsistencies between Dr. Poulin's representations in the *Saman* litigation and those in this case could create an inference that Dr. Poulin is engaged in conduct that is morally untoward.  In the "assignment" of the Saman employment contract defendants state that "Dr. Poulin has informed [Virginia Hematology] of his intention to resign" and "without the revenues generated by Dr. Poulin, [Virginia Hematology] will not be able to perform its obligations to [Dr. Saman]."  In contrast, in this litigation, Dr. Poulin testifies that he has not resigned from Virginia Hematology, that Virginia Hematology is fully operative and generates significant income, and that VHO is essentially non-operative.

Defendants next argue that plaintiff cannot allege the requisite level of "injustice" and, therefore, that amendment of the complaint is futile.  According to defendants, the "injustice" that plaintiff alleges is nothing more than "difficulty collecting a debt."  As indicated, it appears neither Virginia nor California law would permit plaintiff to pierce the corporate veil for a mere breach of contract.

Defendants misstate plaintiff's allegations.  Plaintiff clearly alleges that Dr. Poulin, individually and/or on behalf of Virginia Hematology, and VHO have engaged in conduct motivated by bad faith and/or fraudulent intent.  Plaintiff asserts that defendants have fraudulently transferred Virginia Hematology's assets,

without its liabilities, to VHO in order to render Virginia Hematology judgment proof and evade its obligation to OTN but, at the same time, to enable Dr. Poulin to continue operating his/their oncology practice through VHO.

Again, the inconsistencies between Dr. Poulin's statements in the *Saman* litigation and those here, and the evidence that Dr. Saman's employment contract was transferred to VHO are sufficient, at the pleading stage, to support amendment of the complaint. Therefore, even if Virginia law requires some identifiable "legal wrong," plaintiff has adequately alleged it.

Accordingly, we find that plaintiff's proposed alter ego/successor liability allegations are not "futile."

### E.    Miscellaneous Orders re Form of First Amended Complaint

As stated on the record at the hearing, plaintiff's First Amended (and, if applicable, Supplemented) Complaint must (1) name every defendant in the caption, (2) for each claim, identify which defendant or defendants that claim runs against, and (3) for each claim, identify the capacity in which each defendant is being sued -- *e.g.*, individually, as alter ego for Virginia Hematology, as successor in interest for Virginia Hematology, etc.

Additionally, Plaintiff's Proposed First Amended Complaint names "Doe defendants." The Ninth Circuit rejects the use of Doe defendants in diversity actions. *Fifty Assoc. v. Prudential Ins. Co. of America*, 446 F.2d 1187 (9th Cir. 1970). Plaintiff has presented no reason to believe that other potential defendants whom it is currently unable to identify exist. Although we grant plaintiff's request for leave to amend the complaint, we ORDER plaintiff to remove references to "Doe defendants" from the First Amended Complaint.

37

1   Finally, because we grant Dr. Poulin's Motion for Summary Judgment,
2   plaintiff must remove its claim that Dr. Poulin personally guaranteed Virginia
3   Hematology's debt under the CAA from the First Amended Complaint.
4
5   **III.   Case Management Schedule**
6       **By Tuesday, February 21, 2006,** plaintiff must file with the Court and
7   serve on defendants its First Amended (and, if appropriate) Supplemented
8   Complaint.
9       **By Monday, March 13, 2006**, defendants must file with the Court and
10  serve on plaintiff their responsive pleading.
11      The Court VACATES the previously entered stay of discovery.
12      As explained with more particularity on the record, **by Friday, March 31,**
13  **2006,** the parties must have informally exchanged all documents that evidence the
14  amount of the debt incurred by defendants and must have met and conferred in
15  person or via telephone to address any questions by either party about that
16  evidence.
17      On February 7, 2006, the Court referred this action to a Magistrate Judge for
18  a settlement conference to be conducted in the first half of April 2006 or as soon
19  thereafter as possible.
20      **By Wednesday, April 20, 2006**, the parties must file a jointly-submitted
21  case management conference statement.  The parties' joint statement must include,
22  among other things, a detailed discovery and motion practice plan, proposed
23  deadlines for completing discovery and hearing motions, and a proposed trial date.
24      **On Monday, April 24, 2006, at 1:00 p.m.**, the Court will conduct a case
25  management conference.
26  //
27  //
28

38

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CONCLUSION

For the reasons stated above, the Court GRANTS defendant's Motion for Summary Judgment on plaintiff's claim that Dr. Poulin is personally liable as a guarantor of the debts in issue of Virginia Hematology Oncology.  Judgment will be entered on plaintiff's claim for breach of a personal guaranty in favor of Ronald Poulin and against plaintiff, OTN.

The Court also GRANTS plaintiff's Request for leave to file a First Amended Complaint on the condition that (1) plaintiff directly names VHO as a party defendant, (2) plaintiff removes references to Doe defendants, (3) plaintiff removes its claim that Dr. Poulin personally guaranteed Virginia Hematology's debt, and (4) for each claim, plaintiff identifies every defendant that the claim runs against and the capacity in which each defendant is sued.

IT IS SO ORDERED AND ADJUDGED.


Dated:  February 10, 2006                    /s/  Wayne D. Brazil_____
                                                          WAYNE D. BRAZIL
                                                          United States Magistrate Judge

Copies to:
All parties (via electronic mail)
WDB, Stats.

39